UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CLARK TRULY,
    Plaintiff,

vs.                                                                  03-1178

COMPREHENSIVE HEALTH CARE SERVICE, et al.,
    Defendants.

### CASE MANAGEMENT ORDER

    This cause is before the court for consideration of Defendants Brush, Riggs and Pierson's Motion for Summary Judgement [d/e 143]; Defendants Clark, Harmon, Hamby, Meldrum and Stokes' Motion for Summary Judgement [d/e 146] and the Plaintiff's Cross Motion for Summary Judgement [d/e 150].

### I. BACKGROUND

    The plaintiff, a state prisoner, originally filed this lawsuit pursuant to 42 U.S.C. §1983 against 17 Illinois Department of Corrections defendants. On March 16, 2005, the court conducted a merit review of the plaintiff's complaint and found the plaintiff had the following surviving claim: that Defendants Dr. Hamby; Nurses Meldrum, Harmon, Clark and Stokes; Officers Brush and Riggs and Warden Pierson violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical condition. The claim is against the defendants in their individual capacities only. Specifically, the plaintiff alleged that due to the lack of treatment for his asthma condition, he suffered "six potentially fatal asthma attacks" during a four day time period in July 2002. (Comp., p. 10)

### II. FACTS

    The plaintiff entered the Illinois Department of Corrections (herein IDOC) on February 25, 2002 at Stateville Correctional Center. The plaintiff had a 22 year history of asthma. On February 26, 2002, an IDOC physician prescribed asthma inhalers for the plaintiff including an Aerobid and Albuterol inhaler. However, the doctor also ordered that the inhalers were to be discontinued when the prescription expired. One of the reasons for this instruction was the doctor's belief that the plaintiff did not know how to properly use the inhalers.

    In March of 2002, the plaintiff was transferred to Hill Correctional Center where he remained until July 17, 2002. Dr. Hamby was the Medical Director at Hill Correctional Center. He states that when the plaintiff was transferred, his medical status was evaluated by both the transferring and the receiving facility. Dr. Hamby says on March 7, 2002, he reviewed the plaintiff's medical records and noted that the inhalers were to be discontinued. Therefore, the

doctor decided to write a prescription for a handheld nebulizer to be available for the plaintiff if he experienced any shortness of breath when his previously prescribed inhalers ran out.

The plaintiff's Albuterol inhaler ran out on July 3, 2002. The plaintiff says he still had his Aerobid inhaler and continued to use it daily. In addition, the plaintiff claims on the night of July 3, 2002, Lieutenant Peddicord told him that correctional officers would monitor him by waking him every hour to make sure he was okay. Defendant Correctional Officers Brush and Riggs say they did not work the same hours as the lieutenant and did not receive those instructions. Officers Brush and Riggs worked from 11:00 p.m. on July 3, 2002 to 7:00 a.m. on July 4, 2002.

The officers say while they were not given any instructions to monitor the plaintiff, officers did walk through the wing approximately every 30 minutes. An officer was also stationed in the "bubble" controlling the doors to the entrance. The plaintiff disputes that officers walked through the area every half hour.

The plaintiff says at about 1:30 a.m. on July 4, 2002, he began to feel like he was going to have an asthma attack. The plaintiff says his attacks usually start small with a slight cough. The plaintiff says he does not use his asthma inhaler until the attack progresses to the point that it feels like someone is compressing his chest. The plaintiff says he spent about ten minutes trying to get his Albuterol inhaler to work because he thought it might have some medication left. He then asked his cell mate to call for a correctional officer.

Officer Riggs says at about 1:40 a.m., he was called to the plaintiff's cell. Both Officer Riggs and Officer Brush say Officer Brush was on a lunch break at the time and was not involved with the plaintiff. Consequently, Officer Brush's name is not listed on the incident report.

Officer Riggs says when he arrived at the cell, the plaintiff was doubled over, said he was asthmatic and complained of chest pains. Officer Riggs says he immediately called for medical help. Riggs says more officers arrived within approximately three minutes and medical staff arrived within approximately six minutes. Officers helped the plaintiff down the stairs, and the plaintiff walked unaided to a van which took him to the health care unit. Officer Riggs says this was the end of his contact with the plaintiff on July 4, 2002.

The plaintiff says later on July 4, 2002, he saw the warden and told him that he had not received proper treatment for his asthma and needed a Albuterol inhaler. The plaintiff says he threatened to file a grievance, but the warden told him to send him a letter detailing his claims.

Between July 4, 2002 and July 8, 2002, the plaintiff made several complaints of shortness of breath to the nursing staff. The plaintiff was seen five other times including: July 5, 2002, twice on July 6, 2002, July 7, 2002 and July 8, 2002. Dr. Hamby says the plaintiff was taken to the health care unit on each occasion and provided the nebulizer treatment that the doctor had prescribed back in March of 2002. After the plaintiff stated that he had improved and the medical staff noted the improvement, the plaintiff was taken back to his cell.

The plaintiff claims he suffered near fatal asthma attacks on each occasion. However, there is no evidence before the court that the incidents were of this magnitude and the court notes the plaintiff was never transported to an outside hospital.

The plaintiff says each time he asked to be admitted to the health care unit, but the nurses refused his requests and sent him back to his cell without an asthma inhaler. The plaintiff says he also was not seen by a doctor on any of these occasions.

Dr. Hamby says since the medical records indicted the plaintiff was not knowledgeable in the use of inhalers on his own, he believed it was "necessary to observe and document his asthma symptoms prior to providing any additional prescriptions." (Def Mot, Hamby Aff, p. 3) Dr. Hamby also states that each time the plaintiff came to the healthcare unit complaining of shortness of breath, "he was appropriately evaluated and treated by the nurses per my orders." Id. The doctor further states that while the nurses could provide an inhaler treatment for the plaintiff, they did not have the authority to give the plaintiff an inhaler that he could take back to his cell.

Dr. Hamby says the plaintiff was advised he could come back to the health care unit at any time he was suffering from shortness of breath, and there was no need to keep him in the health care unit once his symptoms had subsided. Dr. Hamby says "[a]t no time was Mr. Truly at risk of substantial harm due to his lack of inhalers as the handheld nebulizer treatments were readily available to him upon request." (Def Mot, Dr. Hamby Aff, p. 4) The defendants state that the nebulizer treatments are as effective if not more effective than an Albuterol inhaler. In addition, nebulizer treatments can be monitored to determine the amount of medication needed. This information would not be available if the plaintiff had an Albuterol inhaler in his cell. (Plain Memo, Ex.D, p. 9)

Dr. Hamby says on July 8, 2002, he personally evaluated the plaintiff and reviewed his records. Each time the plaintiff was seen in the health care unit, the nurses had taken "peak flow assessments" which the doctor says were helpful in evaluating the plaintiff's condition. Dr. Hamby then prescribed an Albuterol inhaler as well as a "Qvar" steroid inhaler. Id.

Dr. Hamby states that in his medical opinion, the plaintiff "suffered no injury as a result of receiving a handheld nebulizer rather than an inhaler which could be maintained in his cell. In fact, Mr. Truly's care was assisted as he could be more properly evaluated by the medical staff who were able to observe his symptoms and his need for proper medication. (Def. Memo, Dr. Hamby Aff., p. 4-5) Finally, Dr. Hamby states that the plaintiff's asthma does not present a serious risk of harm to the plaintiff as long as he is monitored, "as was appropriately done in this case." (Def. Memo, Dr. Hamby Aff. p. 5)

### III.   LEGAL STANDARD FOR SUMMARY JUDGEMENT

The entry of summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56c. A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine only

if a reasonable jury could find for the nonmoving party. Id.

A party moving for summary judgment initially has the burden of showing the absence of any genuine dispute of material fact based on the evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 153 (1970); Schroeder v. Barth, Inc., 969 F.2d 421, 423 (7th Cir. 1992). A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. Tolle v. Carroll Touch, Inc., 23 F.3d 174, 178 (7th Cir. 1994). The evidence and all reasonable inferences drawn therefrom are viewed in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255. Nonetheless, "(s)ummary judgement is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgement must be granted." Jones v. Johnson, 26 F.3d 727, 728 (7th Cir. 1994).

IV. ANALYSIS

A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The defendants first argue that the plaintiff has failed to exhaust his administrative remedies as required for his claim that the defendants were deliberately indifferent to his serious medical condition from July 3, 2002 to July 8, 2002. The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. §1997e(a). *See also* Perez v. Wisconsin Dept. of Corrections, 182 F.3d 532, (7th Cir. 1999).

The defendants have submitted affidavits from both the Chairperson and the Manager of the Office of Inmate Issues. They state that generally, an inmate must attempt to resolve any issue informally first with his counselor. If the issue remains unresolved, the plaintiff may file a written grievance to a grievance officer. The grievance officer considers the issue and reports his or her findings to the Chief Administrative Officer. This administrator then advises the offender of the final decision. Once the inmate has this response, then he must appeal to the Administrative Review Board (herein A.R.B.) to complete the process. However, if an inmate believes his complaint needs an emergency response, he must send his grievance directly to the Chief Administrative Officer. He then may appeal any decision to the A.R.B.

The defendants argue that the plaintiff's own evidence demonstrates he "jumped the gun" and failed to follow the proper procedures. The plaintiff filed his initial grievance directly to the A.R.B. The Chairperson and Manager of the Office of Inmate Issues also state that they have searched the records of the A.R.B. and there are no documents showing the plaintiff has fully exhausted his administrative remedies.

The plaintiff claims that he did file a grievance on July 4, 2002, but the grievance officer failed to respond or even process his grievance. The plaintiff says he also told Warden Pierson about his concerns on July 4, 2002. The warden told the plaintiff to send him a detailed letter.

The warden further told the plaintiff that any grievance needed to be filed with his counselor. (Plain. Dep, p 59). The plaintiff says the warden never responded to his letter.

The plaintiff also says he sent his grievance to the A.R.B. The board stamped the plaintiff's grievance as received on July 11, 2002, but never addressed the contents. Instead, the grievance was returned to the plaintiff.

The plaintiff claims that it is "undisputed that defendant Pierson, counselor Jefferson, and the A.R.B all received plaintiff's grievance claim and never addressed plaintiff's claim, that constitutes exhaustion." (Plain Resp., p 3) However, to meet the exhaustion requirement, a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1922, 1025 (7th Cir. 2002). There is no evidence the plaintiff submitted a grievance to the grievance officer. There is no evidence the plaintiff submitted a grievance to the warden. Even if the plaintiff did send a letter to the warden, there is no evidence he received it and a letter is not the same as a grievance. The only evidence before the court is a grievance stamped received by the A.R.B. on July 11, 2002. The A.R.B. is not the proper place to send an initial grievance.

It does not appear that the plaintiff has exhausted his administrative remedies as required. However, the court finds that even if the plaintiff had properly exhausted, the court would still grant summary judgment for the defendants.

B. DELIBERATE INDIFFERENCE

The defendants argue that the plaintiff has failed to demonstrate that the defendants were deliberately indifferent to his serious medical condition. The plaintiff must pass both an objective and a subjective test in order to establish that the lack of appropriate medical care violated the Eighth Amendment. Rhodes v. Chapman, 452 U.S. 337, 346 (1981); Wilson v. Seiter, 501 U.S. 294, 297 (1991). The plaintiff must first demonstrate that the alleged deprivation was sufficiently serious. Id. The plaintiff must also show that the Defendants acted with deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." Mathis v. Fairman, 120 F.3d 88, 91 (7th Cir. 1997)(citing Farmer at 840-42).

Allegations of negligence or medical malpractice do not state an Eighth Amendment claim. Ford v. Page, 2001 WL 456427, at 6 (N.D.Ill. April 27, 2001). However, "proof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed. Amendment claim." Jones,151 F.Supp.2d at 945 *citing* Ford, 2001 WL 456427 at 6. A delay in scheduling an appointment for medical treatment may constitute deliberate indifference. Jones v. Simek, 193 F.3d 485, 490-491 (7th Cir. 1999) However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Langston v Peters, 100 F.3d 1235, 1240 (7th Cir. 1996).

The plaintiff has failed to provide evidence that the defendants were deliberately indifferent. The plaintiff did receive treatment each time he complained that he was having trouble breathing and the plaintiff was able to return to normal breathing after receiving the treatment.

In addition, the only direct evidence concerning Dr. Hamby is his decision to write a prescription for the use of handheld nebulizer when he discovered that a previous doctor thought the prescription for the handheld inhaler should expire. There is also evidence Dr. Hamby personally examined the plaintiff on July 8, 2002, and wrote out new prescriptions. Neither instance would show deliberate indifference toward the plaintiff. It is not at all clear Dr. Hamby was aware of the plaintiff's problems from July 4, 2002 to his July 8, 2002 visit.

There is no evidence that Officer Riggs was deliberately indifferent to the plaintiff either. The officer responded to the plaintiff's cell as soon as he knew the plaintiff was having a problem and quickly arranged medical care for the plaintiff. The plaintiff claims Officer Riggs was told to wake him ever hour and check on his condition, but the plaintiff has presented no evidence of this order. There is also no evidence Correctional Officer Brush had any contact with the plaintiff during his asthma attacks.

There is little evidence before the court concerning the warden. The plaintiff says he spoke to the warden on July 4, 2002 and wrote him a letter. There is no evidence indicating that the warden received the letter. Nonetheless, the plaintiff did have an inhaler four days after his conversation with the warden.

Even if the plaintiff was able to show the defendants were deliberately indifferent to his serious medical needs, he has failed to show that any delay in treatment had a detrimental impact on his health. The plaintiff claims the delays caused "hyperinflated lungs" and adverse changes in his asthma. (Plaint Resp, p. 8) However, the only evidence of his claim is a radiologist report dated October 21, 2002 which states that the plaintiff's "lungs appear hyperinflated possibly representing deep inspiratory effort or changes due to asthma." (Plain Resp, Ex. B). The clinical diagnosis is "asthma baseline." This document does not demonstrate the plaintiff suffered any additional harm as a result of his treatment from July 4, 2002 to July 8, 2002. The plaintiff has failed to show that the delay in treatment was a constitutional violation. The defendants' motions for summary judgement are granted.

**IT IS THEREFORE ORDERED that:**

**1) The plaintiff's motion for summary judgement is denied. [d/e 150]**

**2) The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 143, 146] The Clerk of the Court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**3) The agency having custody of the Plaintiff is directed to remit the docketing fee of $150.00 from the plaintiff's prison trust fund account if such funds are available. If**

**the plaintiff does not have $150.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $150.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $150.00.**

**5) The plaintiff is responsible for ensuring the $150.00 filing fee is paid to the clerk of the court even though his case has been dismissed. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full. The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such change.**

**5) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Enter this __29th_____ day of August, 2006.

                            s\Harold A. Baker
        _____
                             HAROLD A. BAKER
                       UNITED STATES DISTRICT JUDGE